## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ALANNAH FRIEDMAN                              Case No: 0:25-cv-60640-AHS

      Plaintiff,

PHILIP MORRIS INTERNATIONAL, INC.,
SWEDISH MATCH NORTH AMERICA, LLC,
SWEDISH MATCH USA, INC. PHILIP MORRIS
GLOBAL BRANDS, INC., and PMI GLOBAL
SERVICES, INC.

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      Zyn is a small, flavored nicotine pouch that users place in their mouths. Like cigarettes and e-cigarettes, Zyn is designed to create and sustain an addiction to nicotine. Nicotine is the fundamental reason why people use these products. Nicotine is a highly addictive drug, just as addictive as cocaine and heroin. Kids, especially, are vulnerable to nicotine addiction. Nine out of ten nicotine users start by the age of 18, and more than 80% who begin as teens will continue into adulthood. Defendants know this. And who better than Philip Morris International? PMI has, for decades, profited by addicting kids to Marlboro cigarettes, the world's most popular brand. It is no surprise then that PMI bought the company, Swedish Match, that makes the most popular oral nicotine pouch. Zyn sales are soaring. Zyn makes up about 70% of the nicotine pouch market. PMI shipped 350 million cans of it in 2023 – a 62% growth compared to the year before. PMI expects to earn $2 Billion in revenue from Zyn in 2024.

2.      Zyn is just a recent iteration of the tobacco industry's historical practice of designing a nicotine delivery device that hooks kids to nicotine while making them think it is not dangerous or harmful.  And so Zyn looks like chewing gum, and it comes in gum-like flavors: "wintergreen," "peppermint," "cool mint," "spearmint," "citrus," "cinnamon" and others. Flavored nicotine exists to addict kids to it.



3.      Advertisements for Zyn emphasize the themes the industry has long-known resonates with kids, like "Freedom," "Finding Your Curiosity," "Never Miss a Moment" and "Find Your Zyn" – a clear play on the word "Zen," which generally connotes peace and inner calm.





4.      Defendants also benefit tremendously from "Zynfluencers," – social media influencers who promote Zyn. There are around 30,000 TikToks under the hashtag #Zyn, which has amassed more than 700 million views.  Another hashtag, #Zynbabwe, has amassed about 95 million views.  Young people are exposed, and according to the CDC, rates of oral nicotine pouch users among middle schoolers and highs schoolers are rising.  Here are examples of such promotion:



freezertarps4333
FREEZERTARPS · 2023-11-30
Hey boys im over here corporate zyn #ched
#upperdeckys
♫ original sound - FREEZERTARPS

461   1   35

https://www.tiktok.com/@freezertarps4333/video

Comments (1)                                    C

rhys
@Conkeyyy my man learnt a trick
2-11        Reply

Log in to comment



5.      In addition to targeting kids through flavors, Defendants use deceptive advertising in describing Zyn as "tobacco-free," which falsely implies that Zyns are not harmful or there is a reduced risk of addiction.  Technically, "tobacco-free" means that no part of the product is derived from the tobacco plant.  But Zyn's nicotine is indeed derived from tobacco.



6.      Defendants further target youth by designing a tobacco or nicotine-based product that looks just like gum or breath mints.










7.     Like too many others, Plaintiff, Alannah Friedman, began using Zyn at the age of 17. She was enticed by the flavors and by Defendants' deceptive advertising.  She brings this suit to redress her injuries caused by Zyn.

## PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff, Alanah Friedman, is a citizen of the state of Florida and resides in the Southern District of Florida.  She began using Zyn when she was about 17. She is addicted to the nicotine contained in Zyn and has suffered personal injuries as a result of her Zyn use.  Plaintiff continues to use Zyn to this day because of her addiction. Plaintiff was influenced by Zyn's marketing and advertising, which drove her purchases of Zyn when she began using Zyn and continued through the time Philip Morris International, Inc., acquired Swedish Match.  Plaintiff has seen Zyn advertising in Facebook and other social media, of the type contained in this complaint, which suggests, falsely, that Zyn is not a tobacco product, and that Zyn is not harmful to one's health.  Plaintiff did not know of Zyn's unreasonably dangerous characteristics when she began using it.  Plaintiff did not know that Defendants were concealing information to Plaintiff regarding potential health effects and the potency of the nicotine addiction.  Defendants' wrongful conduct in marketing, promoting, manufacturing, designing, and selling Zyn caused or contributed substantially to causing her injuries.  She purchased Zyn in the Southern District of Florida and was injured there.

9.     Defendant, Swedish Match North America LLC, is headquartered in Richmond, Virginia, and is a citizen of the state of Virginia.  The sole member of Swedish Match North America LLC, is Defendant Swedish Match USA, Inc., which is a citizen of Virginia.

10.     Defendant, Swedish Match USA, Inc. is headquartered in Richmond, Virginia, and is a citizen of the state of Virginia.  Upon information and belief, Swedish Match USA, Inc. owns Swedish Match North America LLC.  Swedish Match North America LLC and Swedish Match USA, Inc. are collectively referred to as the Swedish Match Defendants.

11.     Swedish Match Defendants design, manufacture, market, advertise, promote, distribute and sell Zyn in the United States, including in the Southern District of Florida.  Plaintiff purchased Zyn in the Southern District of Florida.

12.     Defendant, Philip Morris International Inc. (PMI) is a citizen of the states of Connecticut and Virginia.  It is headquartered in Stamford, Connecticut and is incorporated in the state of Virginia.

13.     Defendant Philip Morris Global Brands, Inc. is a citizen of the states of Delaware and Connecticut.  It is headquartered in Stamford, Connecticut and is incorporated in the state of Delaware.

14.     Defendant PMI Global Services, Inc. is a citizen of the states of Delaware and Connecticut.  It is headquartered in Stamford, Connecticut and is incorporated in the state of Delaware.

15.     PMI is the holding company and/or parent company of various subsidiaries including Swedish Match North America LLC, Swedish Match USA, Inc., Philip Morris Global Brands, and PMI Global Services, Inc.

16.     PMI exerts operational control over all its subsidiaries, including the Swedish Match Defendants.   These subsidiaries function to solely achieve PMI's business purposes, which, as PMI describes its business it in its 2023 Integrated Report:

> A. Philip Morris International (PMI) is a leading international tobacco company, actively delivering a smoke-free future and evolving its product

portfolio for the long term to include products outside the tobacco and nicotine sector.

B. Since 2008, PMI has invested USD 12.5 billion to develop, scientifically substantiate and commercialize innovative smoke-free products.

C. In 2022, PMI acquired Swedish Match – a leader in oral nicotine delivery – creating a global smoke-free champion led by the companies' IQOS and ZYN brands.

17.    In PMI's 2023 Annual Report, PMI's Chief Executive Officer, Jacek Olczak, and Executive Chairman of the Board, Andre Calantzopoulos, authored an opening letter to shareholders that suggests to investors that PMI controls and benefits financially from ZYN. They wrote:

A. In 2023, PMI delivered another year of strong financial performance with excellent organic top-line growth and the very positive contribution of smoke-free products…This reflects the…outstanding growth of ZYN[.]

B. In 2023, our smoke-free portfolio accounted for 36.5% of total net revenues…As of year-end, our smoke-free products had approximately 33 million users and were available in 84 markets.

C. In the attractive oral smoke-free category, ZYN in the U.S. delivered a truly remarkable performance and solidified its position as the clear nicotine pouch category leader.  Outstanding volume growth and a substantial increase in category share in the U.S. were driven by accelerated momentum in consumer off-take and velocities at the retail level (measured in cans per store per week) as well as distribution expansion…[W]e have launched or relaunched ZYN in 10 markets as we work to establish it as a truly global brand.

18.    PMI refers to itself and its subsidiaries as a singular collective unit.  In its SEC filings, like the 2023 Annual Report, PMI represents that ""PMI," "we," "us" and "our" refers to Philip Morris International Inc. *and* its subsidiaries." (emphasis added). PMI's website similarly states that ""PMI" refers to Philip Morris International, Inc. *and* its subsidiaries." (emphasis

added).  PMI has also represented that PMI may mean the family of companies of PMI, and not PMI per se.  No matter how PMI is read – as a standalone, or as PMI *and* its subsidiaries, or the family of companies, PMI exercises control.

19.     There is no differentiation between PMI and its subsidiaries.  They function as one unit with a unified purpose.  For example, PMI has represented in other litigation, under oath and in an attempt to keep certain of its documents confidential and protected from public view, that it is a tobacco company that manufactures and sells among other things, non-combusted tobacco products and other nicotine-containing products; that PMI's focus is to deliver smoke-free products; that PMI takes measures to ensure the secrecy of its documents regarding its smoke-free products; and that PMI would be harmed by the disclosure of its confidential documents.  Writing in the singular, PMI swore to the following:

A. PMI is an international tobacco company engaged in the manufacture and sale of cigarettes, as well as non-combusted tobacco products, associated electronic devices and accessories, and other nicotine-containing products.

B. PMI made a public statement that it had shifted its focus and purpose "to deliver a smoke free future by focusing its resources on developing, scientifically substantiating and responsibly commercializing smoke-free products that are less harmful than smoking, with the aim of completely replacing cigarettes as soon as possible." (citing PMI's Statement of Purpose, Excerpt from 2020 Proxy Statement).

C. Given PMI's focus on smoke-free tobacco and nicotine-containing products, information pertaining to PMI's smoke-free product development and commercialization is critically important to PMI. Because other firms compete with respect to these or similar products, both internationally and in the US, PMI's strategic documents pertaining to PMI's smoke-free products are highly commercially sensitive. Given the time it takes to research, develop, determine a plan for distribution, and receive authorization to commercialize these products, PMI's confidential documents regarding its smoke-free products and the industry will remain sensitive for several years.

D. PMI takes significant measures to ensure the secrecy of its confidential information.

E. PMI has taken and continues to take steps to limit the commercially sensitive information in the Confidential Documents to PMI senior management and select employees.

F. [T]he disclosure of the Confidential Documents to the public, PMI's competitors, and PMI's potential business partners would cause serious injury to PMI.

20.     Whether the above activities are carried out by entities within the "family" of PMI entities, PMI's description of its business activities demonstrates a concerted, singular purpose with PMI in control.  PMI represents, speaks for its subsidiaries, and takes legal action on behalf of its subsidiaries.

21.     This also applies to PMI's control regarding Zyn when it says: "PMI also sells e-vapor products, such as *VEEV*, and oral smokeless products, such as *ZYN* nicotine pouches." (Screenshot below).

10/28/24, 3:33 PM                    Smoking and cigarettes | Frequently asked questions | PMI - Philip Morris International

PHILIP MORRIS
INTERNATIONAL

**Is smoking harmful?**

**Are cigarettes addictive?**

**What is the number 1 selling cigarette brand?**

**Does Philip Morris International still sell cigarettes?**

Philip Morris International sells over 130 brands of cigarettes. PMI's cigarette portfolio is led by *Marlboro*, the world's best-selling international cigarette.

PMI's smoke-free portfolio is led by the *IQOS* heated tobacco brand, which does not burn tobacco, but delivers the nicotine and taste that can satisfy existing adult smokers. The company's ultimate aim is to replace cigarettes with smoke-free alternatives. By September 30, 2024, these alternatives made up over 38 percent of PMI's total net revenues. By 2030, PMI is aiming to raise that to two thirds, thus becoming a majority smoke-free company. PMI also sells e-vapor products, such as *VEEV*, and oral smokeless products, such as *ZYN* nicotine pouches.

In the premium-price cigarette category, *Marlboro* is complemented by *Parliament* and *Virginia S. L&M, Lark, Merit, Muratti*, and *Philip Morris* are its leading mid-price brands. Other leading international brands include *Bond Street, Chesterfield, Next*, and *Red & White*.

PMI also own several important local cigarette brands, including *Dji Sam Soe, Sampoerna A* and *Sampoerna U* in Indonesia; *Fortune* and *Jackpot* in the Philippines; *Belmont* and *Canadian Classics* in Canada; and *Delicados* in Mexico.

SKIP LINK  →

https://www.pmi.com/faq-section/smoking-and-cigarettes

22.    PMI's 10K further makes clear that PMI and its subsidiaries like the Swedish Match Defendants function as one cohesive group.  PMI refers to a Zyn production facility in Kentucky as "*our* ZYN production facility." (emphasis added).  Using PMI's definition of "our", which includes PMI, means that Zyn facility is also PMI's.

23.    The Swedish Match Defendants do not manifest separate corporate interests of their own. Swedish Match Defendants act on behalf of PMI. Upon PMI's acquisition of Swedish Match, Swedish Match delisted its shares on a Nasdaq exchange.  Swedish Match has since worked to integrate into PMI's structure. Swedish Match's 2023 Annual Report describes the "work to

integrate Swedish Match into PMI's global sustainability structure, strategy and policies."[1] Swedish Match represents that "PMI's Integrated Report 2023 presents a consolidated view of both companies." *Id.* Swedish Match further describes its integration into PMI and adoption of PMI's standards: "PMI began its Legal & Compliance integration efforts with Swedish Match to ensure that PMI's standards and requirements are also applied across Swedish Match entities"; Swedish Match is "ensuring that PMI's diversity, equality, and inclusion strategy is implemented throughout the Swedish Match organization"; and Swedish Match is working to integrate into PMI's supply chain.

24.     PMI also exerts control over the Swedish Match Defendants and the sale of Zyn. For example, in June 2024, Swedish Match North America LLC received a subpoena from the Attorney General of the District of Columbia requesting information regarding Swedish Match's compliance with D.C.'s ban of flavored tobacco products. Upon receiving said subpoena, PMI conducted an investigation into the matter, and, at PMI's direction, Swedish Match immediately suspended online sales on ZYN.com.

25.     PMI's public announcements regarding Zyn also evidence PMI's control over the Swedish Match Defendants. On May 3, 2023, CEO Jacek Olczak stated the following on behalf of PMI at the annual shareholder meeting, which recognizes PMIs supportive commercial capabilities fuel Zyn growth:

> A.  2022 was a remarkable year in our smoke-free transformation. We achieved two critical strategic milestones, successfully completing the acquisition of Swedish Match
>
> B.  We are very pleased to welcome the Swedish Match organization to the PMI family, along with their #1 global nicotine pouch brand, *ZYN*. Together we

---

[1] Swedish Match, Annual Report, 2023 (available at) https://www.swedishmatch.com/globalassets/reports/annual-reports/2023-annual-report-swedish-match-ab_eng2.pdf) (last visted Dec. 3, 2024)

are now a global smoke-free champion and leading the industry with scientifically substantiated reduced risk products.

C. There is a significant opportunity to further accelerate *ZYN*'s outstanding success in the U.S., and for international expansion with the support of PMI's commercial capabilities. Importantly, we believe the acquisition is financially attractive and will be accretive to our growth, margin profile and cash generation over the coming years.

26.    On July 16, 2024, "PMI announced an investment of $600 million over the next two years through one of its U.S. affiliates to open a state-of-the-art manufacturing facility in Aurora, Colo.  The facility is expected to create 500 direct jobs with ongoing annual economic impact of $550 million and an additional 1,000 indirect jobs for the State of Colorado as it produces Swedish Match *ZYN* nicotine pouches…."

27.    On August 27, 2024, PMI announced a $232 million investment through one of its Swedish Match affiliates to expand production capacity of its manufacturing facility on Kentucky. These announcements demonstrate that PMI is actively investing in or controlling the investment of manufacturing facilities to produce ZYN for commercialization in the U.S.

28.    Employees within PMI's family of companies consider themselves as employees of PMI.  This is evident if one searches for employment opportunities on SwedishMatch.com. There, clicking on the "Career" tab takes the applicant to a PMI website: joinpmicareers.com.  If the applicant looks for jobs in the United States, numerous employment opportunities in Aurora, CO are listed. (PMI made a $600 million investment there).  The applicant will not only see PMI's logo, at the top of the page, but the job description reads, in pertinent part: "Be a part of a revolutionary change! We've chosen to do something incredible at Philip Morris International (PMI).  We're totally transforming out business…to deliver a smoke-free future…Join us at PMI!" This further shows that PMI subsidiaries and PMI operate as one cohesive group and that PMI has

control over the Swedish Match Defendants. The following is demonstrative:









29.     PMI is also responsible for setting the marketing policies, which regulate its subsidiaries, again demonstrating control over how subsidiaries must operate. PMI has a Code for Design, Marketing and Sales of Non-Combusted Alternatives and its Implementation Guidelines. Code applies to the Swedish Match Defendants.  It is mandatory: "All PMI employees directly involved in developing or deploying Adult Consumer-focused product, packaging, Advertising, Marketing, engagement, and Sales initiatives for Non-Combusted Alternatives must follow this Code and the Implementation Guidelines that accompany it."  The Code "establish[es] the core principles, practices, and governance processes to follow when developing, designing, marketing, engaging with Adulting Consumers about, and selling PMI's Non-Combusted Alternatives to Combusted Tobacco Products." PMI considers Zyn a smoke-free, non-combusted product. The Code is approved by PMI's CEO and contains PMI's logo.

30.     Upon information and belief, PMI further controls regulatory filings and communications on behalf of its subsidiaries with the U.S. FDA regarding combustible and non-

combustible tobacco products, which includes Zyn.

31.     PMI also funds trade groups like Foundation for a Smoke-Free World, that purport to be independent scientific organizations, but instead generate "science-for-profit."[2]  Various FSFW activities have helped ensure research favorable to the tobacco industry.  FSFW is now goes by the name Global Action to End Smoking, which continues to be funded by PMI.  On May 1, 2024, the GAES issued a press release on Zyn, claiming that nicotine pouches are a reduced-risk nicotine product, and that such pouches reduce the rate of combustible cigarette smoking.  GAES is funded by Defendant PMI Global Services, Inc. at the control of PMI.  PMI boasts that it has invested $12.5 billion to "develop, scientifically substantiate, and commercialize smoke-free products."  Zyn has not been approved by FDA as a modified risk tobacco product or a smoking cessation device.  It would be unlawful for PMI to directly state that Zyn is reduced risk.  So it fronts a purported agency to make the claims it cannot make.

32.     PMI also has Florida-specific contacts.  For example, PMI hired firms to lobby Florida law makers in an effort to transform its image as a purveyor of cigarettes to "smoke-free" products.[3]  According to LinkedIn, various people who hold themselves out as employees for PMI reside in Florida. Kevin Kelsy, a Senior VP for PMI resides in Miami Beach, Florida.  Jessica Coral, a People & Culture Business Partner at PMI, resides in Miami, Florida.  Their employment profile contains the PMI logo and their respective work experience states they work for PMI.

33.     Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc. provide various services to the Swedish Match Defendants regarding and assisting in their business

---

[2] Legg, et al. Document Analysis of the Foundation for a Smoke-Free World's scientific outputs and activities: a case study in contemporary tobacco industry agnogenesis (May 2023)

[3] Philip Morris hires U.S. lobbyists as key IQOS launch nears (available at) https://www.reuters.com/business/retail-consumer/pmi-hires-us-lobbyists-key-iqos-launch-nears-2023-09-27/ (last visited Dec. 3, 2024)

operations, including regulatory compliance, risk, legal issues, facility and security operations, and accounting and finance activities.  The Swedish Match Defendants have contracts for services with Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc.  These services are part of the Swedish Match Defendants' integration into PMI and, upon information and belief, assist the Swedish Match Defendants' manufacturing, marketing, promotion, and sale of Zyn.

34.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because: (i) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (ii) the parties are citizens of different States.

35.     This Court has personal jurisdiction over the Swedish Match Defendants because they have committed the acts complained of herein in this State and in this District.  The Swedish Match Defendants design, manufacture, promote, market and sell Zyn, in the United States, including Florida. They personally availed themselves of doing business in this District.

36.      This Court has personal jurisdiction over PMI.  PMI publicly represents, among other things, that it sells Zyn, and is investing in facilities to manufacture and commercialize Zyn in the United States.  Florida is among the markets where Zyn is sold. Based on the allegations above, PMI also controls the Swedish Match Defendants. PMI therefore has personally availed itself of doing business in this District.

37.     This Court has personal jurisdiction over Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc. because they provide services to the Swedish Match Defendants as described in this Complaint, which assist the Swedish Match Defendants in its integration into PMI, and its business operations.

38.     This Court has personal jurisdiction over Defendants for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, *inter alia*,

regularly conducting and soliciting business in this State and this District, deriving substantial revenue from products and/or services provided to persons in this State and this District, and in some circumstance, from products and services provided from persons in this State.

39.    A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the Southern District of Florida.  Plaintiff purchased Zyn in this District and was harmed as a result of her usage.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in said District.

40.    The term Defendants, herein, means Defendants collectively.

## FACTUAL ALLEGATIONS

41.    Zyn is an oral nicotine product (ONP) that comes in a pouch, a small, pillow-like container.

42.    The nicotine in Zyn is derived from tobacco leaf but the pouches do not contain the tobacco leaf itself.  Instead, they contain pharmaceutical grade nicotine salt and other ingredients like flavors.[4,5]

43.    Zyn works by delivering nicotine orally.  The nicotine leaks out of a permeable wrapper and is absorbed into the bloodstream through the oral mucosa, the lining of the mouth.

44.    Once the user places Zyn in her mouth, the nicotine immediately takes effect, increasing heart rate and blood pressure, followed by the release of dopamine and other neurotransmitters. The release of dopamine signals pleasure and keeps users addicted.

---

[4] Ramamurthi, Divya; Chau, Cindy; Zhuojing, Lu; Rughoobur, Ilina; Sanaie, Keon; Krishna, Partha; Jackler, Robert MD. *Marketing of "Tobacco-Free" and "Synthetic Nicotine" Products*, White Paper, Stanford Research into the Impact of Tobacco Advertising.  March 8, 2022, (available at) https://tobacco-img.stanford.edu/wp-content/uploads/2022/03/13161808/Synthetic-Nicotine-White-Paper-3-8-2022F.pdf

[5]    *Can Nicotine Pouches Like Zyn Harm Your Health?*    (available at) https://www.nytimes.com/2024/01/25/well/live/zyn-nicotine-pouches-health-risks.html

45.     Zyn is available in nicotine concentrations of 3mg, 6mg, and 8mg.

46.     Zyn is designed to create and sustain addiction to nicotine.  A typical cigarette smoker absorbs 1mg of nicotine into the body per cigarette.  Zyn's own research shows that at its 3 mg nicotine concentration, 1.59 mg of nicotine per single pouch is absorbed into the body; at its 6 mg concentration, 3.51 mg of nicotine per pouch is absorbed; and at its 8 mg concentration, 3.79 mg of nicotine per pouch is absorbed.[6]  Zyn, therefore, delivers a potent dose of nicotine into the bloodstream.

47.     The Swedish Match Defendants, and since its acquisition, all Defendants falsely maintain that Zyn is a smokeless nicotine replacement therapy from cigarettes or e-cigarettes, yet the nicotine concentration levels in Zyn exceed the levels found in nicotine replacement therapies.[7] Defendants have not received authorization from the FDA to market its product as a modified risk tobacco product or tobacco cessation device.  What's more, Nicotine pouches are available in a wider variety of flavors compared to FDA approved nicotine replacement gum or lozenges.[8]

48.     The Swedish Match Defendants, and since its acquisition, all Defendants also falsely maintain that Zyn is "tobacco-free."  It is not.  The nicotine in Zyn is derived from tobacco. Promoting Zyn as "tobacco-free" and like descriptors such as "cleaner than anything out there," or placing Zyn among produce – as in the Zyn advertisements below – explicitly or implicitly represents that Zyn is less harmful that other nicotine-based products, or that Zyn contains less of

---

[6] Lunell, Erik, et al. *Pharmacokinetic Comparison of a Novel Non-tobacco-Based Nicotine Pouch (ZYN) With Conventional, Tobacco-Based Swedish Snus and American Moist Snuff.*  Nicotine & Tobacco Research, 2020, 1757-1763.

[7] Majmundar, Anuja, et al. *Nicotine Pouch Sales Trends in the US by Volume and Nicotine Concentration Levels From 2019 to 2022.*  JAMA Network Open, Substance Use and Addiction. 2022; 5(11):e2242235.

[8] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis.* JMIR Formative Research. 2023; 7:e39146. (available at) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/

a substance, like nicotine, than others, or that Zyn is free of a substance compared to others.  All of which is false, misleading, and purposefully targets youth and naïve tobacco users.





49.     Defendants have long known that nicotine is the fundamental reason that people persist in using nicotine-based products.

50.     According to the U.S. Surgeon General, about 90% of nicotine users start by the age of 18, of which, more than 80% will continue using into adulthood.  Moreover, and more than 80% of whom choose brands that are most heavily advertised.[9]  Defendants have long known this as well.

51.     Defendants' business model today is exactly how Philip Morris described it long ago:

> Today's teenager is tomorrow's potential regular customer and the overwhelming majority of smokers first begin to smoke while in their teens. . . . The smoking patterns of teen-agers are particularly important to Philip Morris. . . the share index is highest in the youngest group for all Marlboro and Virginia Slims packings. At least a part of the success of Marlboro Red during its most rapid growth period was because it became the brand of choice among teenagers who then stuck with it as they grew older.

> "Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers ... 15 to 19 years old . . . my own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17-year-olds."

> "The ability to attract new smokers and develop them into a young adult franchise is key to brand development."[10]

52.     To "get our share of the youth market," as Claude Teague of R.J Reynolds, PMI's one-time conspirator, had said, Defendants employ the same kind of fraudulent and deceptive youth marketing business practices that PMI has been using for decades – the very practices

---

[9] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, Surgeon General., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html (last visited, Feb. 29, 2024).
[10] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

adjudged to violate federal racketeering laws. They exploit themes that resonate with teenagers while falsely deny doing so.[11]

53.     For decades, Philip Morris intentionally exploited adolescents' vulnerability to imagery by creating advertising that utilizes themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion…and being "cool."[12]



54.     The Swedish Match Defendants, and since its acquisition, all Defendants just replaced Marlboro with Zyn.

55.     One recent study showed that Zyn is gaining popularity among teens because of Defendants' increased marketing.[13]  The study found that the marketing of oral nicotine products

---

[11] *USA v. Philp Morris*, 449 F. Supp. 2d 1 (D.D.C. 2006) (J. Kessler).

[12] *Id*., 449 F. Supp. 2d at 571.

[13] Gaiha, Shivani M; Lin, Crystal; Lempert, Lauren K; Halpern-Felsher, Bonnie.  *Use, marketing, and appeal of oral nicotine products among adolescents, young adults, and adults*.

was "remarkably similar to the marketing for popular tobacco products."[14]  Participants under 21 felt targeted by Zyn's marketing.  Among the 2,738 study participants who saw the Zyn marketing, 28.1% felt that it targeted "people younger than me."  Those in the 13-20 year age group were more likely to buy Zyn based on its marketing if they perceived the marketing was about good tasting flavors or helping to feel comfortable in social situations.[15]

56.     Defendants use and promote flavors that are known to entice underage users.[16] "Taken as a category, mint/menthol/ice flavors were the most popular.  These findings mirror studies demonstrating the popularity of flavored tobacco products such as e-cigarettes."[17]

57.     The reason why Defendants use chewing gum flavors is to capture non-tobacco users through the use manipulative techniques to make a product attractive to the uninitiated.  The problem, however, is what lies beneath.  Drug addiction.  This strategy is in keeping with and expanding on the internal knowledge of the nicotine industry.  As Claude Teague stated perfectly in a secret memo "…the non-[cigarette] smoker has little or no knowledge of what satisfactions it may offer him and no desire to try it.  Instead, we must somehow convince him with wholly irrational reasons that she should try smoking, in the hope that she will for herself then discover the real "satisfactions" obtainable."[18]

---

Addictive Behaviors 140 (2023) 107632.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Research and Planning Memorandum on The Nature of the Tobacco Business and the Crucial Role of Nicotine Therein.* 1972. Claude Teague, RJR Confidential. https://www.industrydocuments.ucsf.edu/docs/kpkj0191



RESEARCH PLANNING MEMORANDUM

ON

THE NATURE OF THE TOBACCO BUSINESS AND THE CRUCIAL

ROLE OF NICOTINE THEREIN

desire.  We have deliberately played down the role of nicotine, hence the
non-smoker has little or no knowledge of what satisfactions it may offer him,
and no desire to try it.  Instead, we somehow must convince him with wholly
irrational reasons that he should try smoking, in the hope that he will for
himself then discover the real "satisfactions" obtainable.  And, of course, in

58.      "Satisfaction" in tobacco industry lingo means nicotine addiction.  The flavors

Defendants use are the "wholly irrational reasons" to use flavored nicotine, which makes Zyn

unreasonably dangerous and defective.

59.      Defendants' marketing efforts are paying off. Zyn made its debut in 2014.  Since

2016, it has become the overwhelming market leader of oral nicotine pouches.[19]  Nationwide sales

of nicotine pouches continued to rise dramatically, as 808 million pouches were sold in the first

three months of 2022 alone.  Zyn has accounted for about 60% of those sales.

60.      PMI bought Zyn for $16 Billion in 2022.  PMI's marketing efforts and tobacco sale

know-how has fueled growth and secured market dominance as exhibited in this chart:

---

[19] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on
Internet and Traditional Media: Content Analysis*. JMIR Formative Research. 2023; 7:e39146.
(available at)
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/

61.     Zyn is unreasonably dangerous, and therefore defective, particularly for youth. Chief among the reasons is that Zyn creates and sustains an addiction to nicotine.  Nicotine is a drug that is as addictive as heroin and cocaine.[20]



62.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

63.     The Surgeon General has explained how nicotine affects the developing brain and

---

[20] *See e.g.,* US Department of Health and Human Services. *Nicotine Addiction: A Report of the Surgeon General*. DHHS Publication Number (CDC) 88 -8406, (1988).

can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults.[21]

64.     Nicotine use during adolescence disrupts the formation of brain circuits that control attention, learning, and susceptibility to addiction. Research has shown early age of nicotine use is correlated with daily use and lifetime nicotine dependence.[22]

65.     Nicotine exposure during adolescence likely has lasting adverse consequences for brain development.[23]

66.     Nicotine use can also intensify symptoms of depression and anxiety.  It also increases stress levels.[24]

67.     Overall, with chronic drug use, the brain becomes chemically altered, transforming a user into an addict.[25]

68.     Nicotine poses other health hazards.  For example, nicotine use is associated with increased risk of cardiovascular, respiratory, and gastrointestinal disorders. There is decreased immune response and it also poses ill impacts on the reproductive health. It affects cell proliferation, oxidative stress, apoptosis, DNA mutation by various mechanisms which leads to

---

[21] *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

[22] *Nicotine and the young brain.* Truth Initiative, Jun. 8, 2022.  (available at) https://truthinitiative.org/research-resources/harmful-effects-tobacco/nicotine-and-young-brain.

[23] U.S. Department of Health and Human Services.  *E-Cigarette Use Among Youth and Young Adults.  A Report of the Surgeon General.*  CDC, Office of Smoking and Health; 2016.

[24] *Id.*

[25] *Neurochemical Effects of Nicotine*, Tobacco Dependence and Treatment for Smokers with Co-occurring mental illnesses (available at) https://iprc.indiana.edu/training/courses/Tobacco%20Dependence%20and%20Treatment/a_04_05_01.html

cancer. It also affects the tumor proliferation and metastasis and causes resistance to chemo and radio therapeutic agents.[26]

69.     Health experts are also concerned that Zyn causes gum damage and periodontal disease.[27] That's because oral nicotine pouches like Zyn contain toxic chemicals, which can lead to injury of the gums.  "Persistent, recurrent injury can end up leading to inflammation, infection, but most importantly cancer."[28]

70.     Defendants fail to disclose these health risks.  The "warning" saying "This product contains nicotine.  Nicotine is an addictive chemical" is entirely insufficient to communicate the true extent of the dangers posed by Zyn.

## CAUSES OF ACTION
## CAUSE OF ACTION I
### Strict Liability – Design Defect

71.     Plaintiff incorporates paragraphs 1–70 by reference as though set forth fully at length herein.

72.     The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed.  PMI controls the Swedish Match Defendants and all PMI subsidiaries.  Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida.  Given PMI's control over its subsidiaries, it is as if PMI designed manufactured,

---

[26] Mishra, Aseem, et al. *Harmful effects of nicotine.*  Indian J Med Paediatr Oncol. 2015 Jan-Mar; 36(1): 24-31.
[27] *What is Zyn? Doctors share health concerns of the popular and controversial nicotine pouch.* February   8,   2024   (available   at)   https://www.cbsnews.com/news/zyn-health-impacts-controversial-nicotine-pouch/
[28] *Id.*

assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

73.     Zyn was designed and intended to be used as a method of ingesting nicotine and the other constituents in the Zyn pouch.

74.     Zyn was sold in a defective condition that is unreasonably dangerous and unsafe, and posed a substantial likelihood of harm to Plaintiff because of reasons including the high delivery of nicotine, the likelihood of nicotine addiction and the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

75.     Zyn was sold in a defective condition that is unreasonably dangerous and unsafe to Plaintiff because the Swedish Match Defendants, and since its acquisition, all Defendants failed to adequately warn about the risk of nicotine addiction and failed to warn of the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

76.     The Swedish Match Defendants designed and promoted Zyn to specifically appeal to minors and young adults, who were particularly unable to appreciate the risks posed by Zyn.

77.     The Swedish Match Defendants designed Zyn with a pharmacokinetic profile engineered to create risks of abuse and addiction.

78.     The Swedish Match Defendants defectively designed Zyn that is inherently dangerous because it included features making the product attractive and more palatable to youth and non-smokers.  These features include its concealability and its so called "tobacco-free" condition, which is false and misleading.

79.     Zyn does not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect, as Zyn is designed to cause and sustain nicotine addiction, delivers a potent amount of nicotine, and is likely to cause behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

80.     The risks inherent in the design of Zyn significantly outweigh any benefits of such design.

81.     The Swedish Match Defendants, and since its acquisition, all Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine, and/or did not have flavors that attract youth like Plaintiff.

82.     Plaintiff used Zyn as intended or in reasonably foreseeable ways.

83.     Plaintiff's injuries, physical, emotional, and economic, were reasonably foreseeable at the time of Zyn's design, manufacture, distribution, and sale.

84.     Zyn was defective and unreasonably dangerous when they left the Swedish Match Defendants' possession.  The defects continued to exist through the products' sale to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

85.     Plaintiff was injured as a direct and proximate result of Zyn's defective design as described herein. The defective design of Zyn was a substantial factor in causing Plaintiff's harms.

86.     Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys'

fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION II

### Strict Liability – Failure to Warn

87.    Plaintiff incorporates paragraphs 1–70 by reference as though set forth fully at length herein.

88.    The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed.  PMI controls the Swedish Match Defendants and all PMI subsidiaries.  Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida.  Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

89.    Zyn was sold in a defective condition that is unreasonably dangerous and unsafe to Plaintiff because the Swedish Match Defendants, and since the acquisition, all Defendants failed to adequately warn about the risk of nicotine addiction and failed to warn of the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

90.    Defendants were aware that Zyn posed risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of Zyn.

91.    Zyn is defective because, among other reasons described herein, the Swedish Match Defendants, and since the acquisition, all Defendants failed to warn consumers, including Plaintiff,

in Zyn's labeling, packaging, and through the marketing promotion, and advertising of Zyn including that:

    a.   Zyn causes, maintains, or aggravates nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, i.e., compulsive behavior can result in, and that this danger was even greater for minors;

    b.   Zyn causes harm by increased exposure to nicotine and other harmful ingredients;

    c.   Zyn is a nicotine delivery device not intended for persons under 26 years old;

    d.   Zyn delivers nicotine derived from tobacco;

    e.   Zyn delivers nicotine at greater levels than nicotine replacement therapies;

    f.   Zyn carries risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

    g.   Which and when medical symptoms warranted medical care; and

    h.   How many Zyn pouches are safe to consume in a day.

92.    The failure to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of Zyn.

93.    Ordinary consumers would not have recognized the potential risks of Zyn when used in a manner reasonably foreseeable to Defendants.

94.    Defendants are strictly liable for the sale of defective Zyn products that contained inadequate warnings.

95.    Plaintiff could not have averted injury through exercise of reasonable care for reasons including Defendants' concealment of the true risks posed by Zyn.

96.    Zyn was defective and unreasonably dangerous when they left Defendants'

possession because it lacked adequate warnings.  The defects continued to exist through the products' sale to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     The Swedish Match Defendants, and since the acquisition, all Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein.

98.     Plaintiff was injured as a direct and proximate result of Defendants' failure to warn because Plaintiff would not have used or purchased Zyn had Plaintiff received adequate warnings and instructions.

99.     Defendants' lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiff.

100.     Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION III

### Negligence

101.     Plaintiff incorporates paragraphs 1–70 by reference as though set forth fully at length herein.

102.     The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed.  PMI controls the Swedish Match Defendants and all PMI subsidiaries.  Philip Morris Global Brands and PMI Global Services provide necessary services to

the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida. Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

103.    Zyn was the type of product that could endanger others if negligently made, promoted, and sold.

104.    The Swedish Match Defendants, and since the acquisition, all Defendants had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling Zyn to avoid causing harm to those that consumed Zyn.

105.    The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care that the risks of consumers of Zyn, a powerfully addictive and dangerous nicotine delivery device.

106.    The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to Zyn.

107.    The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that Zyn was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

108.    The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that Zyn was designed to cause or

sustain nicotine addiction, and that Zyn posed a risk of harm including risks of addiction, behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, promotion, and sale of Zyn.

109.    The Swedish Match Defendants, and since the acquisition, all Defendants  knew or should have known through the exercise of reasonable care that Zyn needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

110.    The Swedish Match Defendants, and since the acquisition, all Defendants  knew or should have known through the exercise of reasonable care that Zyn could cause serious risk of harm, particularly to young persons and minors.

111.    The Swedish Match Defendants, and since the acquisition, all Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

112.    The Swedish Match Defendants, and since the acquisition, all Defendants  breached their duty of care by, among other things:

a.  Failing to perform adequate testing of Zyn prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, gastrointestinal, and periodontal, and other related medical conditions, as well as its effect on mental health;

b.  Failing to inform or warn consumers, including Plaintiff, that Zyn had not been adequately tested or researched prior to marketing to ensure safety;

c.  Failure to take reasonable care in the design of Zyn;

    d.   Failure to take reasonable care in the advertising, promoting, and marketing of Zyn;

    e.   Failure to warn consumers, including Plaintiff, of the dangers associated with Zyn, including that it was unsafe, is powerfully addictive, can cause permanent changes in the brain, mood disorders, and impairment of thinking and cognition;

    f.   Failure to use reasonable care in the sale of Zyn without adequate warnings; use of flavors and design to appeal to minors and young people;

    g.   Misleadingly stating that Zyn is "free of tobacco";

    h.   Failure to provide any instructions regarding a safe amount of Zyn to consume in a day;

    i.   All other failures, acts and omissions set forth herein.

113. The Swedish Match Defendants, and since the acquisition, all Defendants further acted and or failed to act willfully and with conscious and reckless disregard for the rights, interests, and safety of Plaintiff, and Defendants acts and omissions had a great probability of causing significant harm; and in fact resulted in such harm.

114. The Swedish Match Defendants, and since the acquisition, all Defendants reasonably should have foreseen that young people would try Zyn and quickly become addicted, resulting in teenagers and young adults developing lifelong addictions.

115. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein.

116. Defendants' negligence was a substantial factor in causing and or contributing to Plaintiff's harms.

117. Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## <u>CAUSE OF ACTION IV</u>

**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(§§ 501.201–.213, Fla. Stat.)**

118.    Plaintiff incorporates paragraphs 1–70 by reference as though set forth fully at length herein.

119.    Plaintiff is a "consumer" as defined in section 501.203(7), Florida Statutes.

120.    Plaintiff purchased Zyn in Florida for personal purposes.

121.    The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed.  PMI controls the Swedish Match Defendants and all PMI subsidiaries.  Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida.  Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

122.    The Swedish Match Defendants, and since the acquisition, all Defendants conducted and continue to conduct "trade or commerce"—as defined in section 502.203(8), Florida Statutes—of Zyn in Florida.

123.    The Swedish Match Defendants, and since the acquisition, all Defendants violated and continue to violate section 501.204(1), Florida Statutes, by engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" in Florida.

124.    The Swedish Match Defendants, and since the acquisition, all Defendants made and continue to make representations, omissions, and practices that are likely to mislead a consumer acting reasonably in the circumstances, to the consumer's detriment.

125.    The Swedish Match Defendants, and since the acquisition, all Defendants portray Zyn as cool and safe alternatives to combustible cigarettes and e-cigarettes, with a particular emphasis on appealing to minors based in part on flavors, while representing or omitting facts concerning Zyn's nicotine content, addictiveness, flavoring content, and safety.

126.    The Swedish Match Defendants', and since the acquisition, all Defendants' marketing, promoting, and advertising contained statements like "tobacco free" when in fact Zyn is derived from tobacco.

127.    The Swedish Match Defendants, and since the acquisition, all Defendants represented Zyn as safe, healthful, or not harmful.

128.    The Swedish Match Defendants, and since the acquisition, all Defendants made misleading representations about and omitted the risks associated with Zyn generally. Defendants omitted that the nicotine in Zyn can cause cognitive and mental health injuries, periodontal disease, vascular injuries. Defendants omitted that Zyn was powerfully addictive and that its design inherently demanded dependency.

129.    The Swedish Match Defendants, and since the acquisition, all Defendants' marketing, promoting, and advertising omitted that Zyn was an extremely potent nicotine delivery device; Zyn was designed to create and sustain nicotine addiction; and posed significant risks of substantial injury resulting from use of Zyn.  Promoting Zyn as "tobacco-free" and like descriptors such as "cleaner than anything out there" explicitly or implicitly represents that Zyn is less harmful that other nicotine-based products, or that Zyn contains less of a substance, like nicotine, than others, or that Zyn is free of a substance compared to others.

130.    Defendants' representations and omissions were likely to mislead a consumer acting reasonably in the circumstances and influence them to purchase Zyn, to the consumer's

detriment. A reasonable consumer would likely have been misled that Zyn: (a) is a smoking-cessation device (even though it is not); (b) is a reasonable alternative to combustible or e-cigarettes (even though it is not); (c) is not a potent nicotine-delivery mechanism (even though it is); (d) is not powerfully addictive (even though it is); (e) is healthy and safe (even though it is not); (f) does not pose unreasonable risks of substantial bodily injury resulting (even though it does), and (g) is not derived from tobacco (even though it is).

131.    Defendants' representations and omissions offended established public policy and were immoral, unethical, oppressive, unscrupulous or substantially injurious to customers.

132.    Defendants' representations and omissions were made on social media from the time that Plaintiff began using Zyn and have continued to this date.

133.    Defendants' deceptive or unfair practices allowed and allow Defendants to command a price premium and overcharge customers for Zyn. Defendants' representations and omissions promised a value for Zyn that is higher than what was delivered.

134.    Plaintiff suffered actual damages by purchasing Zyn at a price more than it is worth. Alternatively, Plaintiff suffered actual damages in the amount that Plaintiff paid for Zyn because Zyn is valueless.

135.    Plaintiff seeks restitution, attorneys' fees, costs, and any other relief this Court deems just or proper, as provided by sections 501.211 and 501.2105, Florida Statutes, and applicable law.

**PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants to the full extent of the law, including but not limited to:

1.  Judgment for Plaintiff against Defendants;

2. Damages to compensate Plaintiff for injuries sustained as a result of the use of Zyn, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, medical expenses, economic harm;

3. Punitive damages;

4. Attorneys' fees and costs;

5. Prejudgment and post-judgment interest at the lawful rate;

6. An order certifying the proposed classes, designating Plaintiffs as the named representatives of the classes, and designating the undersigned class counsel;

7. A trial by jury on all issues;

8. Any other relief the Court deems just and proper.


Dated: October 17, 2025                By:     /s/ Jeffrey L. Haberman
                                                Jeffrey L. Haberman
                                                Florida Bar No.: 98522
                                                Scott P. Schlesinger
                                                Jonathan R. Gdanski
                                                Malaak Abdulrazzak
                                                **SCHLESINGER LAW OFFICES, P.A.**
                                                1212 SE Third Avenue,
                                                Fort Lauderdale, FL 33316
                                                Telephone: (954) 467-8800
                                                jhaberman@schlesingerlaw.com
                                                *Attorneys for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all issues.

Dated: October 17, 2025          By:     <u>/s/ Jeffrey L. Haberman</u>
                                         Jeffrey L. Haberman
                                         Florida Bar No.: 98522
                                         Scott P. Schlesinger
                                         Jonathan R. Gdanski
                                         Malaak Abdulrazzak
                                         **SCHLESINGER LAW OFFICES, P.A.**
                                         1212 SE Third Avenue,
                                         Fort Lauderdale, FL 33316
                                         Telephone: (954) 467-8800
                                         jhaberman@schlesingerlaw.com
                                         *Attorneys for Plaintiff*